Case number 23-6075, Charles Carroll v. Idemia Identity and Security USA, LLC, Oral Argument Not to Obscene, 15 minutes per side. Heather Collins for the appellant, you may proceed. Good morning. Good morning. We'd like to reserve three minutes for rebuttal. Very well. Appellant Charlie Carroll requests reversal of the district court's order because when drawing all inferences in his favor and not making credibility determinations, he demonstrated a reasonable jury could conclude he was subjected to unlawful discrimination on the basis of disability and age. In particular, the district court erred when it determined that Mr. Carroll was unable to demonstrate pretext. The district court misapplied the honest belief test as to the facts in this case and that inquiries about Charlie Carroll's health were consistent with business necessity when, in fact, they were not. Here, Mr. Carroll offered a pretext on multiple bases. He offered approximately a dozen examples. Let me ask you this, and I've read your brief and all the different examples. I just want to, as it relates to the three areas of pretext, which one is your client operating under? It seems like he's taking a position he's not going under a lack of basis in fact. Correct. So, which one? That it did not actually motivate or it was insufficient. Okay. And the biggest reason that you can draw that inference and some of the biggest examples of pretext really started not right at the time of termination, although there were examples of the time of termination, but it preceded that. So, earlier in the year, I'm not sure if you would recall, but from the briefing in January, he received the 100% employee rating based off of his being instrumental in leading the business unit that got a multi-billion dollar contract with UES2. Then right on the heels of that, he disclosed not just about his cancer because he had previously disclosed his cancer diagnosis to the CEO of the company, but that he had had a recurrence of the cancer. And that was what really changed from the CEO merely knowing that he had prostate cancer, which was really sort of in a latent stage. It was kind of in remission prior to this timeframe. But in that January timeframe, he let the CEO know, my cancer's come back and I'm going to receive treatment. And then that's when things changed, but there was very little attention paid. Where in that process that Mr. Carroll, and you may classify this as a demotion, but where he received an increase in his salary, which made him the highest paid among the folks on the executive committee, where does that take place on the spectrum that you're talking about? Sure. The discussions for that started in June. He made the disclosure of his recurrence of cancer earlier the year, as I stated, in that February timeframe. But immediately after that in April, the CEO started having discussions with the group CEO who's in France about moving him out of his position. There was almost an immediate change. And so how that relates to what happened in June, where they moved him out is in those discussions that they had, and their emails with this, and this is part of the record entry, 80-18, is that in those emails, they were talking about, we're going to have him out of here by December with no severance. The main thing is, is that we want him to transfer his contacts to other people. So no matter what, they were making these plans in April that came on the heels of his disclosure. I mean, weren't they making it earlier? I thought the CEO, when he came in, said, I'm going to get everyone that's on the executive committee, and Mr. Carroll was on the executive committee. No, that was, he made this statement that he had come in and he said it was his general way of doing things that he does replace people. But he did not make the statement he was going to get rid of everyone, including Charlie Carroll. That was not, that specific statement was not made. He had a general way of doing things and there was general evidence and testimony that, oh, lots of CEOs come in and they clean house and they, you know, bring in their own C-suite. But in fact, he was, he was bringing other people up. He wasn't, and there were some people that were staying there. So it wasn't an across-the-board cleaning of house. But going back to your initial question, how does that relate to what happened in June and him being paid more? The conclusion was already set. You know, they made this decision in April, right after he disclosed his cancer diagnosis, that they were going to have him out by December without a severance. So it didn't matter, is really the answer to your question. It didn't matter what they negotiated, what they paid him, because in fact they did have him out well before December. They had him out at the end of October, the 1st of November. November 6th was the date of his termination. It wasn't just a matter of discussion in that email. It was a plan that, you know, that this is what they were going to do. They were going to get someone else to come in. And this again came right on the heels of his disability. There was no discussion prior to this that they were moving him out. In fact, he had just gotten the Employee of the Year Award. His business unit had been lauded for bringing in this multi-billion dollar contract. So there was no reason to believe that someone of his level at the company couldn't actually get through and make Trusted Fan a successful... But wasn't the issue really was it sort of the Trusted Fan? Wasn't that really the issue? Well, that's what they said was the issue. And Trusted Fan was riddled with problems. I mean, there's no doubt about that. And we're not contesting that as an issue of fact. I mean, Trusted Fan program and Mr. Carroll was repeatedly raising these issues with the CEO and with the rest of the executive team. A lot of the problems that Mr. Carroll was repeatedly raising was idemia and the groups, which is again the European arm of it, their insistence that Trusted Fan use digital labs, which was the international digital platform or technology platform and group that they used to develop technology. But they just weren't efficient and they weren't moving at the pace that Mr. Carroll thought that they should move in for Trusted Fan to be successful for the 2020 games, venues, concerts, those sorts of things, which they were eyeing towards. So there was... The argument seems to be that the business model for Trusted Fan was failing. How do you respond to that? Because it seems like everyone agreed in the end that it had failed and there's evidence in the record that he spoke with the new leader and was unable to answer questions or unable to provide a plan for how to save it. Why is that wrong? Well, I don't think that it was a matter of saving Trusted Fan. I think that it was getting it back on track. And he had been involving the executive leadership for a long time, how to get it back on track. They had just had the meeting with the CEO and Charlie Carroll in Boston with Merrick and their text messages that was Exhibit 26 in the record. I think that it was 80-13, that where they're talking during that meeting, we got to get Merrick to do this. We're going to... Where Casey's saying that, you know, I'm going to start pressing down on his neck and am I being too hard on him? And they're talking in that meeting how they're going to drive change. Casey's saying that to Mr. Carroll. But it was well acknowledged, and this even goes back to July, and there's a record where, you know, they had that meeting, I believe it was in India, of the international conglomerate, where they're talking about the problems with Trusted Fan and the digital aspect of it and how they need to get that back on track. So that was something that was always going on in the background that Mr. Carroll was always concerned and always raising with the executive leadership. But again, what was happening in this timeframe is the email from April between De La Brea, hope I'm not mispronouncing that, and Casey, was that they were going to replace him. They were going to have him out by December. And that's what they were working to do. They were bringing in this younger, probably healthier person to take over the Trusted Fan division, A. J. M. Lonnie, and he had just been hired approximately a month before Mr. Carroll got out. So he was getting involved, unbeknownst to Charlie, about everything about the Trusted Fan program and getting into that spot. They had already taken him off of the UES project and the other things with security services in July when they moved Donnie Scott to take over that role. So they were slowly training. Are you asserting an independent claim that Idemia engaged in unlawful medical inquiry? Is that clear? I know there's a little discussion here, but I'm not sure I see it. No, Your Honor. That is not an independent, separate claim. That was raised by Idemia as really a defense. And the judge raised that. And if I'm not mistaken, well, I may be wrong. I can't remember if Idemia raised it or if the judge raised it, but that was brought up in the judge's order that the discussions where Casey was asking Mr. Carroll repeatedly about his health, that that could be considered a medical inquiry, a valid medical inquiry. And the position was that no, that that was not a valid medical inquiry because Mr. Carroll had not requested an accommodation. There was no legitimate reason to have done so. So that's not a separate claim. Okay. The other thing that I wanted to point out was that with respect to the honest belief test, that that part was, they, the, Idemia pointed out that his, the flaw with Mr. Carroll citing to Babb. And I wanted to point out that with respect to Babb, they said that, well, this case didn't have a smoking gun, like in Babb versus Maryville anesthesiologist. And, but right after the decision was made to terminate Charlie Carroll, there was yet another email from Yann Delabriere from ADVENT, the group in France. And he's talking with another member about the reason they're moving Mr. Carroll out was due to his capacities to run Trusted Fan. Now, a reasonable jury could take, just like they could take all these other emails and the sequence of events, but a reasonable jury could take this email where he's talking about Mr. Carroll's capacities to run Trusted Fan as more evidence of disability discrimination or age discrimination. And I see that my time. Any further questions at this time? Judge Gramps, Judge Bant, sorry. Ms. Collins, you'll have your three minutes rebuttal. Thank you. Good morning. Good morning, your honors. May it please the court, Ms. Collins. My name is Jeremy Sosna and I'm here on behalf of Idemia along with my colleague, Claire Welch. And we would urge the court to affirm the entry of summary judgment. And I know your honors have read the briefs. So I'll focus on, I think, what are the most important points, which is the Honest Belief Rule and the Honest Belief Rule under BAB. How does the Honest Belief Rule fit in the allegations here following our Briggs case? Yeah, I think it fits perfectly with the Briggs case. I think Briggs and BAB are, in fact, very similar in this respect. In both Briggs and BAB, the employer came forward with what they believe were particularized facts showing that they had a belief that there was a good faith basis, a reasonable basis to terminate on reasons that were unrelated to the employee's protected classification. And the difference between BAB and Briggs in this case is that in both of those cases, there was other evidence, direct evidence, that would indicate that the decision, or at least a reasonable jury, could conclude that the decision was not, in fact, based on the reasons given. That's very different than here, where... I'm sorry, go ahead. No, it just, Briggs, the claim here is that the proffered reasons didn't actually motivate the adverse action. And didn't Briggs say that the honest belief rule does not apply in that circumstance? I don't believe Briggs says that it doesn't apply in that circumstance. It applies if the employee brings forward evidence to show that the reasons given, the particularized facts, were not a reasonable reason. It doesn't say that it does not apply in our view. What it says is that if the employee comes forward with evidence, the honest belief rule would be eviscerated, Your Honors, if all the plaintiff had to do in each case is say, that's not true. And I think there's a key distinction there's a difference between bringing forward evidence showing that the reasons given by the company under its honest belief are false, or that there's reason to question whether or not the company actually relied on that, versus what Mr. Carroll is doing here, which is he's not questioning whether the reasons exist. In fact, Ms. Collins just mentioned this. Everyone agrees Trusted Fan was a disaster. And everyone agrees that Mr. Carroll was the executive, the member of the executive team. Let's say we read Briggs to say that the honest belief rule only applies if we're talking about no basis in fact. How do you respond to the pretext arguments as it relates to did not actually motivate putting aside the honest belief rule? Sure. I think the Ms. Collins restatement of the facts is not consistent with the record. Your Honor, the record shows that in fact, it's in our brief at I believe page seven. It shows that Mr. Casey came in and specifically said, I'm cleaning house. And in fact, that's what he did. He removed every member of the executive team and replaced them. The record also shows, this is again before the timing that Ms. Collins was talking about with regard to Mr. Carroll's disclosure that his cancer had returned. The who is the group president in France. There's an email discussing exactly this issue, removing Mr. Carroll. And in fact, prior to that, Mr. Casey had approached Mr. Delabriere and the Chertoff group, which was the security group. Because in Briggs, we're looking at the concept is the question to you was this doesn't apply in no basis. In fact, no, it doesn't imply whether it actually motivated and that concedes there may be some basis in fact. And so your argument that there's some basis in fact accepted. And now the question becomes, what does the evidence show actually motivated the discharge? In your honor, I think the evidence shows there's ample evidence that the evidence shows that Mr. Carroll was terminated because he was responsible. He's being paid $450,000 a year to oversee the most important initiative of this company, the growth driver. And in fact, as the court and this court has said, pretext is a common sense concept. And I would question this common sense interpretation of the facts. Mr. Casey, the CEO is responsible for the VCP, which is the creation plan. It's the initiative to drive revenue for the company. Mr. Casey then decides to give the most important opportunity for growth revenue that the company has to Mr. Carroll. And Mr. Carroll's argument is this was all a ruse to exit him from the company. That common sense doesn't make sense. It would not make sense for Mr. Casey. And we can look at the record in terms of the communications between April and June between Mr. Casey and Mr. Carroll. It certainly does not reflect that Mr. Casey wants to exit him. In fact, it's the opposite. He consistently says, I want you here. Common sense would say that it doesn't make sense that Mr. Casey would promote Mr. Carroll, give him a $100,000 raise, ample bonuses for the most important initiative for the company, only to then find an opportunity to fire him. Now, this is also consistent with the evidence. The evidence shows that Mr. Casey was talking about this well before Mr. Carroll's reoccurrence of cancer. Now, Ms. Collins mentioned that that was in January and January or February of 2019. And that's not true. That was in their own brief and their reply brief in this court on page six. At the earliest, it was March. So March of 2019, Mr. Carroll discloses his cancer. And an abundance of communications with Mr. Carroll, where he is supporting Mr. Carroll, trying to obtain raises for Mr. Carroll, and says consistently, I want you to stay. Common sense would dictate that that demonstrates that there is no motivation here that's based on his disability. In fact, it's the opposite. If Mr. Carroll... Isn't his argument that you did, in fact, do a form of demotion, because he had brought in the largest dollar amount ever in the other category of business that he oversaw. And that category, which had that big additional earning result, now goes to somebody else. And he's left with trusted fan only. I'm understanding that his argument is that was... At that point, we knew there were problems and we were working somewhat together. There are questions about how to go forward in that problem with the problem in trusted fan. But there's also evidence that a very large moneymaking component of things that he had overseen successfully was removed from his overview and given to somebody else. And he was left with one that really was going to take some work to say. And in your honor, respect... Yeah, respectfully, that only matters if it's motivated by his disability and he has evidence. Now, here's the problem with that argument is even in Ms. Collins' chronology, which again is flawed because the first time that he allegedly disclosed that he needed to go to Germany for treatment was according to Ms. Collins. We have it as June. But even if that were the case, even if it were January, in October of 2018, they're already having these discussions. And in fact, much earlier than that, because Mr. Casey viewed Mr. Carroll as having mismanaged this UES, the TSA pre-program. So that's one problem. The second problem with that narrative is this. Mr. Carroll chose. The record is undisputed. The text messages and the emails between Mr. Carroll, Mr. Casey, first offered Mr. Carroll something that Mr. Carroll said, okay, I'll think about this. And he said, I don't want it. I want both TSA pre and trusted FAN. And it had already been decided in October of 2018, that wasn't the choice. So Mr. Casey went back to Mr. Carroll and said, you choose. So Mr. Carroll's perception that this was a demotion is one of his own making. Mr. Carroll decided to take trusted FAN. Now, ultimately that was the wrong decision. Had he taken TSA pre, which was a successful component of IDMU's business, perhaps we wouldn't be standing here today. But the reality is, is that that was a choice that he made and he received a promotion, both in title, both in responsibilities and significantly in compensation. Very hard to see when faced with those facts, especially the timing, because it's hard for the decision in October of 2018 to be motivated by Mr. Carroll's reoccurrence of cancer, if at that time he hadn't announced it. So there is nothing improper about Mr. Casey and Mr. Delabriere deciding that they are going to move an executive from one function to the next. So absent some evidence that it was motivated, and of course that can't be the case here because that decision was being made in the summer and the fall of 2018, well before Mr. Carroll disclosed his need to go to Germany. So that timing doesn't work. And in addition to that, this was his choice. IDEMIA gave Mr. Carroll the opportunity to take, he kept saying, I want both, and ultimately said, I'll take this. And not only did he say that, he said, I'll take trusted FAN if I receive all of these raises, I want this, I want more bonuses. And the evidence shows that the person who is charged with making the ultimate decision to terminate Mr. Carroll went back to Mr. Delabriere and said, we need Charlie, give him these things that he's asking for. And that's ultimately what happened. Now, the ultimate decision was based on what happened after that. And none of the facts relating to what happened after are in dispute. What happened after is Mr. Casey had some significant concerns about the progress of this huge initiative for IDEMIA that Mr. Carroll had been representing was going to generate at least $5 million of EBITDA the following year in 2020. Now, of course, EBITDA is a form of profit, meaning that the actual revenue that Mr. Carroll was predicting would be generating was far greater. And it was clear that that was not happening. And so this isn't Mr. Casey on his own evaluating Mr. Carroll's ineffectiveness in this role. This was Mr. Mallon, Mr. Amlani, and Mr. Casey all coming to the exact same conclusion. And the straw that broke the proverbial camel's back is again, something that is completely undisputed, which is that Mr. Casey, after learning from Mr. Mallon, that the trusted fan was completely in disarray, decides I've got to go to Franklin, Tennessee, and I've got to find out for myself. And during that meeting, it is undisputed, Mr. Carroll could not answer basic questions about the program that he was predicting was going to be a $5 million generator of revenue. And it's also undisputed that immediately after that meeting in Franklin, Tennessee, that Mr. Casey and Mr. Amlani and Mr. Mallon met, and they decided if we're going to salvage this important initiative for the company, that one of the most senior leaders in the company has not run effectively, we've got to make a change in leadership. And that's what happened. That alone, the timing shows that this decision was not in fact motivated by anything other than its belief that Mr. Carroll was running this inefficiently. And in order for, going back to the honest belief rule, and pretext in general, in order for Mr. Carroll to overcome that, he needs to come forward with something more than that he disagrees with the conclusions that were drawn. I think that's the problem here. This is not about whether or not Mr. Carroll has evidence to demonstrate that the reasons given were wrong or that these things didn't happen. The question is whether or not the conclusion, the ultimate conclusion that was drawn by Mr. Casey and Mr. Mallon and Mr. Amlani was correct. That's a different circumstance. That's a question of whether it was fair versus unlawful. But what is undisputed is that that series of events is what led to Mr. Carroll's, Mr. Casey's decision to terminate Mr. Carroll. And in the absence of other evidence demonstrating that that decision was motivated by Mr. Carroll's disability or age, and of course we haven't touched on age because there's literally zero evidence in the record that would support a claim there. But in absence of evidence that that decision, that decisional process was motivated by Mr. Carroll's disability and the timing suggests that it could not have been, then... Mr. So, if we disagree, here the district court relied in part on the honest belief rule. And if we were to rule that the district court was wrong by applying it, do you lose or do you win anyway? Thank you, your honor. I apologize for interrupting. Does your case rise and fall on the correctness of the application by the district court, the honest belief rule? No, and I see my time has expired. If I could just answer the question. It's kind of important, so please answer. The answer is it doesn't change the result. Because under the pretext analysis, Mr. Carroll still has the burden of coming forward with to demonstrate that an unlawful reason motivated, and there is simply not that in the record. Right. How much money did your client lose by the failure of the entrusted fan program? Well, I don't know that the specific amounts are in the record, your honor, but I will say that I believe what's in the record is that it is that IDEMIA invested millions and millions of dollars into this program. They lost millions and millions. I mean, the argument is they set it up to fail so they could fire this one executive and they ended up losing millions of dollars just to fire the plaintiff. I guess that's the theory, but it seems a little incredible. That's the theory. And I will say there's one other side effect, collateral damage, which is Mr. Casey was fired. And so Mr. Casey, who is ultimately responsible for the success of the DCP, also is no longer with the company. So thank you, your honors. We appreciate the time. Same question about honest belief. Does the case rise and fall on the correctness of the district court applying honest belief rule here? I think that the honest belief rule was misapplied. I tend to agree with you, but does that mean you win? That means I win and it means that a jury hears this case. Tell me why then. Because from a pretext perspective, you set honest belief aside from a pure pretext perspective. The plaintiff set forth enough disputed issues of material fact. And I think that Mr. Sosna's argument... I mean, isn't the evidence overwhelming as to what motivated them? And if it's your argument, I mean, you just view the evidence differently, I think. Is that right? As a jury probably would as well. And that is the entire point, is that a jury needs to hear this case. Isn't it incredible? I mean, your argument is they really lost millions and millions of dollars in this program. And the motivation is so they could fire this person. And that just doesn't seem credible. It doesn't seem realistic. I mean, I can't believe a company would risk all this money and just as a pretext to fire one employee. That's not the full picture. What the full picture is, is that Trusted Fan Program remained a cornerstone of their future value program, how they were going to make money in the future, in addition to the Trusted Fan and the UAS, which Mr. Carroll had already brought in billions of dollars for the company for. But the key is, again, that April email that was between Casey and De La Brea, where they talked about, hey, we're going to get Charlie out of here. We're going to get him out of here by December. But they had to have people to replace him. So it wasn't that they viewed Trusted Fan as a big loser program. It was that they needed to get other people in the right, what they perceived to be the right seats on the bus. And that did not include Charlie Carroll after his cancer disclosure. And I will take issue that nobody, it was not documented anywhere when exactly Mr. Carroll disclosed his cancer had come back. He testified in the record, in his deposition at 78-1, page 1218, I believe is what it is, that he discussed with Casey for the first time that he was going to go to Germany. And that's really kicked off everything that he was having to go back to Germany to start receiving treatment again. And then everything went downhill quickly. Thereafter came the April email between Casey and De La Brea, where they're discussing, we got to get him out of here. Then Casey sends the email in March, just prior to that, where he specifically notifies Mr. Carroll, given these things, and he says, not to mention your upcoming trip to Germany and everything related to that. I'm going to ask Donnie to take lead on what we discussed today, just too much on your plate. And that is at record entry 80-13. So right after... Ms. Collins, you're out of time, but I'll give you a minute to wrap it up. Sure. Mr. Sosna, with his discussion about the facts and the dispute on the facts, demonstrates that a reasonable jury could conclude that he was discriminated against on the basis of disability. And the district court's order should be reversed. Any further questions, Judge Scrooge? Thank you for your arguments. Case will be submitted.